## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, 100 F. Street, NE Washington, D.C. 20549-5030, ) ) ) ) ) | |
| Plaintiff, ) ) | Civil Action No. _____ |
| v. ) ) ) | |
| GENERAL ELECTRIC COMPANY 3135 Easton Turnpike Fairfield, CT 06828, ) ) ) ) | |
| IONICS, INC. 3 Burlington Woods Drive Burlington, MA 01803, ) ) ) ) | |
| and ) ) | |
| AMERSHAM PLC Amersham Place Little Chalfont, HP7 9NA United Kingdom, ) ) ) ) ) | |
| Defendants. ) ) | |

### COMPLAINT

Plaintiff, U.S. Securities and Exchange Commission (the "Commission"), alleges that:

### SUMMARY

1.      This case involves the payment of illegal kickbacks to Iraqi government ministries in connection with sales of humanitarian goods under the United Nations ("UN") Oil for Food Program (the "Program"). From approximately 2000 to 2003, two subsidiaries of the General Electric Company ("GE") -- Marquette-Hellige ("Marquette")

and OEC-Medical Systems (Europa) AG ("OEC-Medical") -- made approximately
$2.04 million in kickback payments in the form of computer equipment, medical
supplies, and services to the Iraqi Health Ministry under the Program. Prior to GE's
acquisition of their parent companies, two other current GE subsidiaries -- Ionics Italba
S.r.L. ("Ionics Italba"), and Nycomed Imaging AS, currently GE Healthcare AS
("Nycomed") -- made approximately $1.55 million in cash kickback payments under the
Program. Nycomed was a subsidiary of publicly-registered Amersham plc, which was
acquired by GE after the conduct at issue in this Complaint and is currently known as GE
Healthcare Ltd. Ionics Italba was a subsidiary of publicly-registered Ionics, Inc., which
was acquired by GE after the conduct at issue in this Complaint and is currently known as
GE Ionics, Inc.

2.      Marquette, OEC-Medical, Ionics Italba, and Nycomed each authorized
and paid kickbacks to Iraqi government ministries through agents in the form of "after-
sales service fees" ("ASSF payments") on sales of products to Iraq. All four subsidiaries
knew that such kickbacks were prohibited by the Oil for Food Program and U.S. and
international trade sanctions on Iraq.

3.      The Oil for Food Program was intended to provide humanitarian relief to
the Iraqi population, then subject to comprehensive international trade sanctions. The
Program allowed the Iraqi government to purchase necessary humanitarian goods, but
required that all purchases be made through a UN-controlled escrow account. The
kickbacks paid in connection with all four subsidiaries' Oil for Food contracts had the
effect of diverting funds out of the escrow account and, with respect to the cash
kickbacks paid by Ionics Italba and Nycomed, into an Iraqi slush fund.

4.     As a result of this conduct, GE, Ionics, and Amersham each violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)] by failing to maintain accurate books and records and by failing to ensure that its subsidiaries maintained adequate internal controls to detect and prevent the illegal kickbacks.

## JURISDICTION

5.     This Court has jurisdiction over this action under Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa]. GE, Ionics, and Amersham directly or indirectly made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

6.     Venue is appropriate in this Court under Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain acts or transactions constituting the violations alleged in this Complaint occurred in this district.

## DEFENDANTS

7.     **General Electric Company** ("GE"), headquartered in Fairfield, Connecticut, is divided into five principal segments: GE Capital; GE Technology Infrastructure; GE Energy Infrastructure; Business & Home Solutions; and NBC Universal. Through these segments, GE participates in a wide variety of markets, including the generation, transmission, and distribution of electricity, lighting, industrial automation, medical imaging equipment, motors, railway locomotives, aircraft jet engines, and aviation services. It has a presence in over 100 countries. Throughout the

relevant time period, GE's common stock was registered pursuant to Section 12(b) of the Exchange Act and listed on the New York Stock Exchange under the symbol "GE."

8.     **Amersham plc, currently GE Healthcare Ltd.,** ("Amersham"), based in the United Kingdom, is currently a wholly-owned GE subsidiary within the GE Technology Infrastructure segment.  GE acquired Amersham plc, the parent company that owned Nycomed, on April 14, 2004, after the conduct at issue in this Complaint. During the Program, Amersham plc listed American Depository Receipts on the New York Stock Exchange and was therefore subject to the jurisdiction of the Commission. Amersham's financial results have been consolidated with those of GE since GE's acquisition of Nycomed's parent company in 2004.

9.     **Ionics, Inc., currently GE Ionics, Inc. ("Ionics")**, based in Burlington, Massachusetts, is a wholly-owned subsidiary within the GE Energy Infrastructure segment. GE acquired Ionics, Inc., the parent company that owned Ionics Italba, on February 22, 2005, after the conduct at issue in this Complaint.  During the Program, Ionics, Inc. was a publicly-listed company in the United States.  Ionics, Inc. was subject to the regulatory jurisdiction of the Commission throughout the relevant period.  Ionics, Inc.'s financial results have been consolidated with those of GE since GE's acquisition of Ionics Italba's parent company in 2005.

## RELEVANT ENTITIES

10.     **Marquette-Hellige** ("Marquette"), based in Germany, is a wholly-owned, third-tier subsidiary of GE within the GE Technology Infrastructure segment.  Marquette manufactures and sells medical equipment.  Among the products it sold to the Iraqi government under the Oil for Food Program were fetal monitors, disposable electrodes,

and transducers. Marquette was a GE subsidiary when the conduct at issue in this complaint occurred, and its financial results were consolidated with those of GE throughout the relevant period.

11.     **OEC-Medical Systems (Europa) AG** ("OEC-Medical"), based in Switzerland, is a wholly-owned, second-tier subsidiary of GE within the GE Technology Infrastructure business. OEC-Medical manufactures and sells medical equipment. It sold C-arms (C-shaped armatures used to support X-ray equipment) to the Iraqi government under the Oil for Food Program. OEC-Medical was a GE subsidiary when the conduct at issue in this complaint occurred, and its financial results were consolidated with those of GE throughout the relevant period.

12.     **Nycomed Imaging A.S., currently GE Healthcare AS** ("Nycomed"), based in Norway, is currently a wholly-owned GE subsidiary within the GE Technology Infrastructure segment. Nycomed manufactures and sells X-Ray and MRI contrast agents. It sold these contrast agents to the Iraqi government under the Oil for Food Program. At the time of the conduct at issue in this Complaint, Nycomed was a subsidiary of Amersham plc, which was acquired by GE on April 1, 2004. Nycomed's financial results were consolidated with those of Amersham throughout the relevant period.

13.     **Ionics Italba S.r.L.** ("Ionics Italba"), based in Italy, is a wholly-owned subsidiary within the GE Energy Infrastructure segment. Ionics Italba manufactures and sells water purification equipment. At the time of the conduct at issue in this Complaint, Ionics Italba was a subsidiary of Ionics, Inc., which was acquired by GE on February 22,

2005. Ionics Italba's financial results were consolidated with those of Ionics throughout the relevant period.

## FACTS

### I.      The United Nations Oil for Food Program

14.     The Oil for Food Program was intended to provide humanitarian relief for the Iraqi population, which faced severe hardship under the international trade sanctions that followed Iraq's 1990 invasion of Kuwait. Starting in December 1996, the Program permitted the Iraqi government to sell its crude oil and use the proceeds to purchase food, medicine, and critical infrastructure supplies. By the end of the Program, Iraq had sold $64.2 billion worth of crude oil and purchased $34.5 billion in humanitarian supplies.

15.     The proceeds of the oil sales were transferred directly from the buyers to an escrow account (the "UN Escrow Account") maintained in New York by the United Nations 661 Committee. Funds in the UN Escrow Account were available for the purchase of humanitarian supplies, subject to UN approval and supervision. The intent of this structure was to prevent the proceeds of Iraq's crude oil sales from undermining the sanctions regime by providing the regime of Saddam Hussein with access to hard currency.

16.     Corruption was rampant within the Program. By mid-2000, all Iraqi ministries participating in the Program followed a policy of demanding that all suppliers of humanitarian goods pay a ten percent kickback on each contract. The kickback requirement was euphemistically referred to as an "after-sales service" fee ("ASSF"). Suppliers competing to obtain contracts under the Program were encouraged to inflate their contract bids by ten percent to cover the ASSF kickback. Once accepted, the

inflated contract prices were incorporated into the Oil for Food contracts.  In this manner, it was the UN Escrow Account that ultimately funded the kickback payments.

17.     Following the 2004 release of a report by the U.S. General Accounting Office exposing some of the abuses, the UN commissioned an independent inquiry committee, headed by former Federal Reserve Chairman Paul Volcker, (the "Volcker Committee") to investigate the Program's performance.  That committee's October 27, 2005, final report estimated that the Iraqi government had diverted $1.7 billion in illicit income from the Program.  Of that, $1.5 billion was derived from kickbacks that were demanded from suppliers of humanitarian goods to Iraq.

18.     Starting in mid-2000, the Iraqi government made a concerted effort to subvert the Program by demanding secret kickbacks from suppliers of humanitarian goods.  Although contracts entered into pursuant to the Program were subject to UN review and approval, the Program gave the Iraqi authorities discretion to select the companies from which they purchased goods and to negotiate contract terms.  Each Iraqi ministry determined what humanitarian goods it needed and circulated tenders seeking requests for bids.  Suppliers submitted bids for the sale of their goods.  After the ministry accepted the winning bid, it informed the supplier that it had to pay an under-the-table kickback in the form of an ASSF to the ministry as a condition of the contract.  The ASSF had to be paid before the goods entered into the country or the shipment would be held at the border.

19.     When the kickback scheme began, suppliers typically met with the Iraqi ministries in person and signed side agreements acknowledging their obligation to pay the kickbacks.  The side agreements were not provided to the UN, as required, when the

Oil for Food contracts were submitted and approved. By October 2000, the kickback

amount was usually ten percent of the total contract value. As the scheme progressed,

and the participants grew more accustomed to making the ten percent payment, the use of

signed side agreements became less common. Suppliers simply increased their original

contract bids by ten percent and submitted the inflated contracts to the UN for approval,

without disclosure of the ten percent kickback. Once a supplier paid the ASSF kickback

to the Iraqi ministry and shipped the goods called for under the contract, the UN Escrow

Account paid the supplier the inflated contract price, unknowingly reimbursing the

supplier for the ten percent kickback.

20.     Following the United States invasion of Iraq in March 2003, the UN,

working with the Coalition Provisional Authority, halted the ASSF kickback scheme. All

Program contracts then pending were renegotiated to back-out the ten percent kickback.

## II.     Payment of ASSFs under the Program

21.     Four current GE subsidiaries, only two of which were GE subsidiaries

during the relevant period, engaged in Oil for Food transactions involving ASSF

kickbacks: Marquette; OEC-Medical; Nycomed; and Ionics Italba. These subsidiaries

entered into a total of eighteen contracts in which ASSF kickbacks were either made or

authorized. In total, the subsidiaries, working through third-party agents, made ASSF

kickback payments of approximately $3,584,842. The four subsidiaries earned profits of

approximately $18,397,949 as a result of their illegal kickbacks.

### A.     In-Kind Kickbacks Paid on Marquette Contracts

22.     Marquette, based in Germany, manufactures and sells cardiology

monitoring equipment and has been a GE subsidiary since 1998. In 2000 and 2001,

8

Marquette entered into three Program contracts in which it either paid or agreed to pay

illegal kickbacks in the form of computer equipment, medical supplies, and services. The

contracts were for the supply of medical equipment (disposable electrodes, transducers,

and fetal monitors) to the Iraqi Health Ministry. The contracts generated a combined

gross profit to Marquette of $8.8 million.

23.    In order to obtain two of the contracts, Marquette's Iraqi agent made

in-kind kickback payments of goods and services worth approximately $1.2 million to the

Iraqi Health Ministry in violation of UN regulations. In order to obtain the third contract,

the agent offered to make an additional in-kind kickback payment worth approximately

$250,000. The illegal kickbacks were made or offered with the knowledge and approval

of Marquette officials.

24.    The Iraqi agent negotiated all three of the contracts on Marquette's behalf.

The contracts were direct agreements between Marquette and the Iraqi Ministry of

Health. As the contracts were being negotiated, both the agent and two Marquette sales

managers were present at meetings with the Iraqi Health Ministry when Iraqi government

officials demanded the payment of ten percent kickbacks. The Marquette officials

declined to make cash payments to the Iraqi ministry. But they acquiesced when their

agent offered instead to make the payments on Marquette's behalf in the form of

computer equipment, medical supplies, and services equal to ten percent of the contracts'

value. The UN regulations governing the Program prohibited extra-contractual payments

of any kind, whether made in the form of goods and services or cash.

25.    In order to cover the cost of the illegal kickbacks, Marquette increased the

Iraqi agent's commission from approximately 13% of the contract price to approximately

23%. The agent used the extra 10% to cover the cost of the equipment and services he kicked back to the Iraqi ministry. The UN contract prices were inflated by a corresponding 10% amount. The UN inspectors were never advised that a portion of the agent's increased commission was intended to cover extra-contractual in-kind kickbacks to Iraqi government ministries.

26.     At one point during the performance of a Marquette contract to supply domes transducers, Iraqi customs officials stopped the Marquette shipment at the border until the shipper could prove that the ASSF kickback payment had been made. Subsequent email exchanges among the shipper, Marquette's Iraqi agent, and Marquette officials, refer to the need to document the ASSF payment. After the Iraqi agent supplied proof of the ASSF kickback payment, the goods were ultimately allowed into Iraq.

27.     Following the U.S. invasion of Iraq in 2003, the third of the Marquette contracts was renegotiated by the UN. During the course of renegotiation, an employee of Marquette's Iraqi agent provided false information to the UN regarding the kickbacks. The agent falsely stated that the contract had been negotiated with the Iraqi Health Ministry before the Iraqi officials began demanding kickbacks on Program contracts. The Marquette sales manager was advised of the misrepresentation to the UN and there is no indication that he made any effort to correct the false statement. When the UN eliminated the ten percent kickback from the contract, Marquette reduced the Iraqi agent's commission from 23% to 13% of the contract price, consistent with the parties' understanding that the kickback was to have been funded out of the agent's commission.

28.     The in-kind ASSF payments were inaccurately described in Marquette's books and records as commissions or other legitimate business expenses. Marquette also

failed to maintain adequate internal controls to detect or prevent the illicit in-kind ASSF payments.

### B.     In-Kind Kickbacks Paid on OEC-Medical Contracts

29.     OEC-Medical, based in Switzerland, manufactures and sells medical equipment. OEC was a GE subsidiary throughout the relevant period. In 2000, OEC-Medical entered into one Program contract that included an illegal kickback payment. The contract was to provide C-Arms (C-shaped armatures used to support X-ray equipment) to the Iraqi Ministry of Health. OEC made an in-kind kickback payment worth approximately $870,000 on the contract and earned a wrongful profit of $2.1 million.

30.     The OEC-Medical contract was negotiated by the same third party agent that handled the Marquette contracts. During the contract negotiation, the OEC-Medical salesman responsible for the contract attended meetings in Baghdad with the agent, where they were told by Iraqi Health Ministry officials that the contract would require a ten percent kickback. As was done with the Marquette contracts, the Iraqi agent agreed to make the payment on behalf of OEC-Medical in the form of computer equipment, medical supplies, and services, rather than cash.

31.     To reimburse the Iraqi agent for the cost of the kickback, OEC-Medical increased the agent's commission on the contract by approximately 10% (from 5% of the contract price to 15%). The contract price that OEC-Medical charged to the UN was artificially increased by a commensurate amount. In order to conceal from UN inspectors the fact that the agent's commission had been increased to cover an illegal kickback, OEC-Medical and the agent entered into a fictitious "services provider agreement" in

November 2000. The fictitious agreement purported to identify services the agent would perform to justify his increased commission. Those services, however, were not part of OEC-Medical's actual contract with the Iraqi Health Ministry and were never intended to be performed. The sham agreement was nonetheless provided to the UN for inspection as part of the contract package.

32.     When the C-Arms were shipped to Iraq in the Summer of 2001, email traffic among OEC-Medical officials, the Iraqi agent, and the shipping company referred explicitly to the need to prove that the kickback payment had been made in order to clear the goods across the Iraqi border. OEC-Medical's Iraqi agent confirmed in writing to OEC-Medical and the shipper that he would see to it that the cost of the kickback would come out of his commission. The in-kind kickback was made, and the goods were subsequently allowed into Iraq.

33.     The in-kind ASSF payments were inaccurately described in OEC-Medical's books and records as commissions or other legitimate business expenses. OEC-Medical also failed to maintain adequate internal controls to detect or prevent the illicit in-kind ASSF payments.

### C.     Cash Kickbacks Paid on Nycomed Contracts

34.     During the Program, Nycomed was a subsidiary of Amersham, which was acquired by GE in 2004  Nycomed's conduct at issue in this Complaint occurred prior to the acquisition. Amersham plc listed American Depository Receipts on the NYSE and was therefore subject to the Commission's regulatory jurisdiction. GE acquired the liabilities of Amersham, along with the assets, in its acquisition of Amersham.

35.     Between 2000 and 2002, Nycomed entered into nine contracts involving the payment of cash ASSF kickbacks. The nine Nycomed contracts were all direct agreements between Nycomed and the Iraqi Ministry of Health for the provision of Omnipaque and Omniscan. Omnipaque is an injectible contrast agent used in conjunction with X-rays; and Omniscan is a contrast agent used in conjunction with magnetic resonance imaging (MRI). Nycomed paid approximately $750,000 in kickbacks on the nine contracts and earned approximately $5 million in wrongful profits.

36.     The contracts were negotiated by Nycomed's Jordanian agent. The kickback payments were explicitly authorized by Nycomed's salesman in Cyprus. The Nycomed salesman increased the agent's commission from 17.5% to 27.5% of the contract price, and artificially increased the UN contract prices by 10%, all to cover the cost of the kickbacks. Numerous email messages between the Nycomed salesman and the Jordanian agent allude to the connection between the increased commission rate and the kickback payments.

37.     In one instance, a UN official inquired into the basis for the 27.5% commission being paid to the Jordanian agent. The inquiry triggered a panicked email message from a Nycomed marketing coordinator in Norway who was also aware of the kickback payments, to officials at Nycomed responsible for handling the UN inquiry. In response, a Nycomed manager sent a letter to the UN falsely describing the work that the Jordanian agent was to perform to justify its commission, omitting that 10% of the 27.5% was to cover Iraqi kickback payments.

38.     The ASSF payments were inaccurately described in Nycomed's books and records as commissions or other legitimate business expenses.  Nycomed also failed to maintain adequate internal controls to detect or prevent the illicit ASSF payments.

### D.     Cash Kickbacks Paid on Ionics Italba Contracts

39.     Ionics Italba was a subsidiary of Ionics, which was acquired by GE in 2005.  Ionics Italba's conduct occurred prior to the acquisition.  Ionics was a publicly-listed company in the United States and was subject to the Commission's regulatory jurisdiction throughout the relevant period.  GE acquired Ionics' liabilities, along with the assets, in its acquisition of Ionics.

40.     Ionics Italba, based in Italy, manufactures and sells water purification equipment.  Between 2000 and 2002, Ionics Italba paid $795,000 in kickbacks and earned $2.3 million in wrongful profits on five Program contracts to sell equipment to the Iraqi Oil Ministry.  The five Program contracts were all direct agreements between Ionics Italba and the Iraqi Oil Ministry for the provision of water treatment equipment.  The contracts were negotiated by Ionics Italba's Jordanian agent.  Four of the five contracts were negotiated with side letters documenting the commitment of Ionics Italba to make the cash kickback payments.  The side letters were concealed from UN inspectors in violation of a Program requirement to provide all contract documentation for inspection and UN approval.

41.     In the first of these contracts, the illegal kickback payment was concealed under a fictitious line item for "modification and adaptation at site of obsolete spare parts."  When UN inspectors in January 2001 requested additional detail about the line item, officials at Ionics Italba passed the inquiry along to the Iraqi Oil Ministry.  The

Ministry's proposed response, which described services neither party intended to be performed, was incorporated nearly verbatim in a letter that Ionics Italba provided to the UN, after which the contract was approved. When the contract was performed, the UN paid for the services in two installments -- 90% for the products called for under the contract and 10% for the phony modification services. The Iraqi Oil Ministry prepared and sent a false invoice to cover the second payment.

42.     In subsequent contracts, the ten percent kickback requirement was simply incorporated into the agent's commission and was not identified in a separate contract line item. On all five contracts, Ionics Italba artificially inflated the prices charged to the UN by 10% to cover the cost of the kickback payments. The purpose of the 10% price increase was not disclosed to UN inspectors. On the majority of the Ionics Italba contracts, the invoices provided by the sales agent included fictitious activities to justify the agent's inflated commission.

43.     The kickback payments are reflected in invoices and bank records of payments from Ionics Italba to the sales agent that served as its payment intermediary. The sales agent made the payments to the Iraqi Oil Ministry through a Saudi Arabian front company acting on the Ministry's behalf.

44.     The ASSF payments were inaccurately described in Ionics Italba's books and records as commissions or other legitimate business expenses. Ionics Italba also failed to maintain adequate internal controls to detect or prevent the illicit ASSF payments.

## CLAIMS FOR RELIEF

### FIRST CLAIM

**[Violations of Section 13(b)(2)(A) of the Exchange Act]**

45.     Paragraphs 1 through 44 are realleged and incorporated by reference.

46.     As described above, GE, Ionics, and Amersham, through their respective officers, agents, consultants, representatives, and subsidiaries, failed to keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected their transactions and dispositions of its assets.  GE Ionics, Inc. and GE Healthcare Ltd., both subsidiaries of GE, are the respective successors to the liabilities of Ionics and Amersham.

47.     By reason of the foregoing, GE, Ionics, and Amersham each violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

### SECOND CLAIM

**[Violations of Section 13(b)(2)(B) of the Exchange Act]**

48.     Paragraphs 1 through 47 are realleged and incorporated by reference.

49.     As described above, GE, Ionics, and Amersham each failed to ensure that their subsidiaries devised and maintained systems of internal accounting controls sufficient to provide reasonable assurances that:  (i) payments were made in accordance with management's general or specific authorization; and (ii) payments were recorded as necessary to maintain accountability for the companies' assets.  GE Ionics, Inc. and GE Healthcare Ltd., both subsidiaries of GE, are the respective successors to the liabilities of Ionics and Amersham.

50.     By reason of the foregoing, GE, Ionics, and Amersham each violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

A.      Permanently restraining and enjoining GE, Ionics, and Amersham from violating Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act  [15 U.S.C. §§ 78m(b)(2)(A) and (B)];

B.      Ordering GE to disgorge ill-gotten gains, with prejudgment interest, wrongfully obtained as a result of the conduct of all four subsidiaries alleged in this Complaint;

D.      Ordering GE to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

17

E.    Granting such further relief as the Court may deem just and appropriate.


Dated:  __July 27__ , 2010


                                        Respectfully submitted,


                                        _____
                                        Cheryl J. Scarboro (D.C. Bar No. 422175)
                                        Tracy L. Price
                                        Robert I. Dodge

                                        Attorneys for Plaintiff,
                                        U.S. Securities and Exchange Commission
                                        100 F Street, NE
                                        Mail Stop 5030-A
                                        Washington, DC  20549
                                        (202) 551-4403 (Scarboro)